# EXHIBIT A



7/20/2021   12:50 AM

FILED
7/20/2021 9:43 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L007305

FILED DATE: 7/20/2021 9:43 AM   2021L007305

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                                   (12/01/20) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

Luca Benusi, Hugh Curry, Harjoat Flora, Karen
Mills, Susanne Pederson and Louise Steele,

_____
                                                        Plaintiff(s)

v.                                            Case No. _____

The Boeing Company

_____
                                                        Defendant(s)

c/o President David Calhoun or other agent
100 N. Riverside, Chicago, Illinois

_____
                                        Address of Defendant(s)

Please serve as follows (check one):  ○ Certified Mail  ○ Sheriff Service  ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court,
within 30 days after service of this summons, not counting the day of service. If you fail to do so, a
judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE
COURTHOUSE**. You will need: a computer with internet access; an email address; a completed
Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/
appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org



**Summons - Alias Summons**                                      **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE:** Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERK'S OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

---

⦿ Atty. No.: 65400

○ Pro Se 99500

Name: Joseph A. Power, Jr. and Kathryn L. Conway

Atty. for (if applicable):

Plaintiffs

Address: 70 W. Madison Street, 55th Floor

City: Chicago

State: IL    Zip: 60602

Telephone: 312-236-9381

Primary Email: kconway@powerrogers.com

Witness date _____

7/20/2021 9:43 AM IRIS Y. MARTINEZ

IRIS Y. MARTINEZ, Clerk of Court

☐ Service by Certified Mail

☑ Date of Service: 7/20/2021
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

FILED DATE: 7/20/2021 9:43 AM   2021L007305



FILED DATE: 7/20/2021 9:43 AM   2021L007305

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info:    (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:    (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:    (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:    (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:    (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:    (708) 232-4551

FILED
7/20/2021 9:43 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L007305

**IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| LUCA BENUSSI, HUGH CURRY, HARJOAT FLORA, KAREN MILLS, SUSANNE PEDERSON and LOUISE STEELE, | ) ) ) ) ) | |
| Plaintiffs, | ) | NO. _____ |
| | ) | |
| v. | ) ) | |
| THE BOEING COMPANY, | ) ) | |
| Defendant. | ) ) | *Plaintiffs Demand Trial by Jury* |

FILED DATE: 7/20/2021 9:43 AM   2021L007305

## COMPLAINT

Plaintiffs LUCA BENUSSI, HUGH CURRY, HARJ FLORA, KAREN MILLS, SUSANNE PEDERSON and LOUISE STEELE, by and through their attorneys, POWER ROGERS, LLP and LITTLEPAGE BOOTH LECKMAN, file this Complaint against the above-named Defendant The Boeing Company (hereinafter, "Defendant" or "Boeing") and state as follows:

## PARTIES

1.      Luca Benussi is a citizen of the United Kingdom, residing in Hayes, London, England.

2.      Hugh Curry is a citizen of the United Kingdom, residing in Silsoe, Bedfordshire, England.

3.      Harjoat Flora is a citizen of the United Kingdom, residing in Warwick Gates, Warwick, England.

4.      Karen Mills is a citizen of the United Kingdom, residing in Kilmarnock, Ayrshire, Scotland.

1

FILED DATE: 7/20/2021 9:43 AM   2021L007305

5.      Susanne Pederson is a citizen of the United Kingdom, residing in Richmond Upon Thames, England.

6.      Louise Steele is a citizen of the United Kingdom, residing in Perth, Perth & Kinross, Scotland.

7.      Boeing is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois.

## VENUE

8.      Venue is proper in this Court under 735 ILCS 5/2-101 because: (1) Boeing is a resident of Cook County, Illinois by virtue of its principal place of business and corporate headquarters here; and (2) the cause of action and claims set forth in this Complaint arise out of acts, omissions, decisions, policies, directions, restrictions, misconduct, negligence, and/or recklessness that, in whole or in part, took place in or emanated from Boeing's principal place of business and corporate headquarters in Cook County, Illinois.

## BACKGROUND

9.      At all times relevant to this complaint, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing and selling commercial aircraft as well as providing information and warnings about such aircraft, including the aircraft at issue.

10.     The facts of this case highlight a previously hidden and "dirty little secret" of the airline industry: air on Boeing's commercial aircraft (with the exception of the Boeing 787 Dreamliner) can become contaminated and injure flight crew and passengers. Cabin air comes in through the aircraft's engines before entering the cabin and cockpit. This is known as a "bleed air" system because outside air is pulled into and then "bled" off the airplane's engines. The air can

2

FILED DATE: 7/20/2021 9:43 AM   2021L007305

become contaminated by heated jet engine oil, hydraulic fluid, jet fuel and the toxic byproducts of such chemicals.

11.     Contaminated air contains toxic chemicals including, but not limited to, neurotoxins such as organophosphates, TCP, TOCP, MOCP, DOCP and ultrafine particles. Inhaling contaminated cabin air can cause short-term or transient symptoms as well as permanent and serious personal injury.

12.     Contaminated air events can also cause serious and potentially catastrophic safety issues. Boeing has known of contaminated air events for decades and is aware that such events can cause flight crew, pilots and passengers to become ill or incapacitated.

13.     By 2007, even Boeing's senior engineers were frustrated with Boeing's refusal to address this safety issue. Senior Boeing engineer George Bates wrote, when commenting on Boeing's utter lack of effort in addressing toxic cabin air events on its airplanes: "*Bottom line is I think we are looking for a tombstone before anyone with any horsepower is going to take interest.*"

14.     The tombstone Mr. Bates predicted came in 2012 with the death of a British Airways pilot, Richard Westgate. Post-mortem testing of Mr. Westgate's blood and tissue showed elevated autoantibody markers, indicative of neural degeneration. Published medical articles about Mr. Westgate's death confirm that he suffered a nervous system injury consistent with organophosphate-induced neurotoxicity. Duke University Professor Abou-Donia noted that Westgate's injury was "one of the worst cases of organophosphate [OP] poisoning [he had] come across."

15.     Boeing refused to acknowledge that Richard Westgate's death was related to his exposure to contaminated cabin cockpit air and continued to misrepresent the facts and details of his death to the flying public and British Airways flight attendants and pilots.

FILED DATE: 7/20/2021 9:43 AM   2021L007305

16.     Despite Mr. Westgate's death, Boeing refused to take any remedial action. Boeing has failed to rectify its flawed and defective bleed air design. Boeing has failed to design, install, implement or provide sensors or alarms to notify the flight crew about contaminated air events so action can be taken to reduce or minimize exposure. Boeing has also failed to design, implement, retrofit or install an air filter or converter into the bleed air system to remove, reduce or mitigate the toxins. Boeing has also failed to provide adequate warnings or training about the dangers of contaminated air events. To this day, Boeing has not made safety concerns about contaminated air events a priority and has instead put profits over the safety of the flying public and flight crews.

## FACTS

**A.      Plaintiffs' Toxic Cabin Air Event: July 28, 2019 (British Airways Flight 66)**

17.     On July 28, 2019, Plaintiffs were working as flight attendants onboard a Boeing model 747 aircraft, tail number G-BYGD ("the aircraft"), operated by British Airways as Flight BA66 ("the flight") from Philadelphia International Airport to London Heathrow Airport.

18.     The aircraft was a "bleed air" airplane designed and manufactured by Boeing.

19.     While the aircraft was still on the ground in Philadelphia, moving away from the terminal and before take-off, there was a contaminated cabin air event, exposing Plaintiffs, other flight attendants, and passengers to toxic fumes from the bleed-air system of the aircraft.

20.     During the contaminated cabin air event, flight attendants and passengers on the aircraft noticed a strange smell, which Plaintiffs immediately reported to Captain Kevin Darby and First Officer David Ingram Hill and described as a "damp, sweaty sock" odor.

21.     Notwithstanding reports of the contaminated air event, the pilots elected to proceed with the flight, and upon information and belief, the aircraft departed from Philadelphia at approximately 7:13 pm ET.

4

FILED DATE: 7/20/2021 9:43 AM   2021L007305

22.     As the aircraft started its ascent, and while the aircraft was still over Pennsylvania, Plaintiffs and passengers were exposed to contaminated air again and the smell worsened.

23.     Plaintiffs again reported the issue to Captain Darby, who initiated a "smoke, fire and fumes" protocol.

24.     During the aircraft's final descent into London, after the twenty-minute call and when the aircraft was over British soil, the smell returned and the flight attendants were once more exposed to contaminated air.

25.     Upon landing in London, passengers remained seated while the sick crew members, including Plaintiffs, exited the aircraft first and received prompt medical attention.

26.     Exposure to the contaminated cabin air before takeoff, at the start of ascent, and right before landing caused Plaintiffs to suffer from immediate symptoms, including shortness of breath, coughing, onset of a metallic taste on their tongues and at the back of their throats, dry mouth, eye irritation, and nausea.

27.     Due to their exposure to contaminated cabin air, Plaintiffs suffered, and will continue to suffer from, short-term and long-term health effects, including: shortness of breath; coughing; metallic taste and smell; loss of taste and smell; nausea; headaches; confusion; fatigue and exhaustion; balance problems; decreased motor skills; tingling and numbness; joint and muscle pain; tremors; dizziness; vertigo; memory loss; trouble concentrating; cognitive defects; emotional distress; mental anguish; depression; anxiety; and aggravation of pre-existing medical conditions.

28.     As a direct and proximate result of Plaintiffs' exposure to toxic cabin air on Boeing's aircraft, Plaintiffs have suffered pain, mental anguish and emotional distress as well as loss of wages and wage-earning capacity in the past and in the future.

FILED DATE: 7/20/2021 9:43 AM   2021L007305

**B.      Boeing's Knowledge of Toxic Cabin Air Events**

29.     With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries. Boeing claims it has "one of the most diverse, talented and innovative workforces anywhere."

30.     Boeing markets itself as "the world's largest aerospace company and leading manufacturer of commercial jetliners" and claims "a long tradition of aerospace leadership and innovation" including "creating advanced technology solutions." Boeing asserts that "safety is its primary consideration."

31.     For at least sixty years, Boeing, and its predecessors, knew (or should have known) that bleed air can become contaminated and cause serious danger to the health and welfare of crew members and passengers.

32.     Boeing has been put on notice, on more than a hundred occasions, that its bleed air system airplanes are unreasonably dangerous and can cause serious acute and permanent injuries to flight crew and passengers.

33.     Boeing has been long aware that heated engine oil and its toxic byproducts can enter the cabin air system. As early as 1953, Boeing knew the bleed air system was "increasingly subject to unacceptable contamination" and that a decontamination or filter unit was needed to "purify engine bleed air to the point where it is suitable for cabin air conditioning." Yet, to date, Boeing has still not designed, created, implemented, retrofitted or added a filter or converter to the air circulation system of the aircrafts that can safely and effectively protect crew members and passengers from contaminated air events.

FILED DATE: 7/20/2021 9:43 AM    2021L007305

34.     Boeing has known since the 1950s that air cabin contamination does not affect everyone to the same degree and some people are physiologically more susceptible to even trace amounts of contaminants.

35.     Boeing is also aware that because of the increased breathing and metabolic rate as well as increased activity of the flight crew, they are more susceptible to injury from contaminated air events.

36.     Toxic cabin air events occur on every type and model of Boeing's airplanes that employ the bleed air system of cabin ventilation.

37.     Contaminated air events occur every day. Boeing tracked over 1,100 toxic air events from 1999 to 2013 and the Defendant assessed 823 of those events as being "potential safety issues." Boeing's manager for its Air Quality Team, David Space, acknowledges that it is reasonable to expect 4.4 contaminated cabin air events (tracked back to oil or hydraulic fluid) each and every day in the United States of America.

38.     The adverse health effects of contaminated air events are well-documented and serious. The FAA's Office of Aerospace Medicine expert, George Day, describes contaminated air events as when "a potentially toxic environment is created by contaminated bleed air" and the FAA recognizes that exposure to contaminated air events can "result in a spectrum of adverse health effects."

39.     The organophosphate chemicals found in Boeing's jet engine compartments are highly neurotoxic, akin to sarin gas. The World Health Organization (WHO) calls the neurotoxins at issue "major hazards to human health" for which "there is no safe level of ingestion" and cautions that exposure through inhalation should be minimized.

FILED DATE: 7/20/2021 9:43 AM    2021L007305

40.     Researchers confirm that exposure to these irritating and toxic chemicals can cause "impairment of neuropsychological function" which can "become more debilitating after time, with problems of loss of cognitive function and memory problems emerging."

41.     Even Boeing acknowledges that flight attendants and passengers develop "real symptoms" from these events.

42.     Published articles acknowledge that exposure to oil fumes can cause "both acute and chronic neurological and respiratory symptoms" and can compromise flight safety. As one study noted, "a clear cause and effect relationship has been identified" between contaminated air events and the development of acute and chronic adverse effects involving the neurological and neurobehavioral systems.

43.     Harvard Professor, Jack Spengler, who is a Boeing consultant and retained expert, has confirmed that flight crews "complain of headaches and eye, skin and upper airway irritation in the short term but go on to experience neuropsychological impairment" as well as other chronic conditions.

44.     In 2004, Boeing launched the Boeing 787 Dreamliner, a commercial aircraft that does not use a bleed air system. The Dreamliner air system eliminates the risk of engine oil decomposition products being introduced in the cabin air supply. One of the reasons Boeing developed a new air supply system for the Dreamliner was to eliminate "engine contaminants potentially entering cabin air supply - Improved Air Quality."

C.     **Boeing Failed to Adequately Investigate, Study, Identify and/or Quantify the Toxins Present During a Contaminated Air Event.**

45.     As a threshold step to appropriately addressing the safety hazard of contaminated air events, Boeing needed to create a list of possible contaminants present during a cabin air event.

FILED DATE: 7/20/2021 9:43 AM    2021L007305

To date, Boeing still has not finalized a list of bleed air and cabin contaminants or surrogates of interest.

46. Boeing has never captured, documented, evaluated, assessed or analyzed a contaminated air incident in-flight. Shockingly, even today, Boeing cannot tell the public what toxins are even present during a contaminated air event or at what levels. Boeing's executive Jacob Bowen admits he has "never seen any data off of an actual airplane" during a contaminated air event. Boeing's senior engineer George Bates confirms that Boeing has "no data of air contamination during a fume or upset event." Rather, Boeing's typical investigation of a contaminated air event involves examining the airplane hours to days after the event, by which time the doors have been opened, the passengers and crew have disembarked, and the contaminated air has dissipated. Even Boeing's chemist Jean Ray agrees that "unless you're actually there monitoring" during the contaminated air incident, "there's no way to know for sure what contaminants were there during that event." So while Boeing knows it is exposing its customers to various levels of poisonous gas, Boeing has done nothing to study the levels of gas present, their varying causes, or the adverse health effects on passengers and crew.

47. All in-flight air samples done to date thus capture only normal flight operations. And even that data is alarming: the neurotoxin tricresyl phosphate (TCP) has been found on airplanes during even normal operation. Independent researchers confirm that, when cabin air was tested even under normal flying conditions, "significant concentrations of organophosphate neurotoxins and other noxious substances in cabin air" were found. In 2009, when investigative reporters secretly took wipe samples from inside a number of airplanes, all under normal operations, "out of 31 samples, 28 were found positive for TCP."

FILED DATE: 7/20/2021 9:43 AM   2021L007305

48.     Boeing consistently represented that it was committed to studying and gaining "a comprehensive understanding of air quality components through research and analysis." In reality, Boeing repeatedly cut or removed funding from air quality projects.

**D.     Boeing Has Downplayed, Minimized and/or Misrepresented the True Incidence Rate of Contaminated Air Events.**

49.     Boeing has repeatedly provided inaccurate or outdated incidence statistics to the traveling public and flight crews. Through these misrepresentations, Boeing encouraged complacency, deterred and distracted research efforts and impeded or prevented development and implementation of safer technologies.

**E.     Boeing Failed to Develop, Install and/or Implement Filters or Converters.**

50.     Feasible and effective filters and converters, which could remove or significantly reduce airborne toxins, have been available since 2003. The most well-tested of these is the Combined Hydrocarbon Ozone Converters (CHOC) which Boeing could have, and should have, installed on its bleed airplanes. CHOC converters function similar to a filter except the CHOC captures the toxic contaminants and turns those chemicals into more benign compounds. CHOC converters are effective at reducing contaminants, thus making the bleed air system safer for passengers and crew.

51.     Adding CHOC converters to Boeing planes would be easy, as the CHOC slides right into the same slot in the bleed air system as the existing ozone converter. The CHOC unit actually fits into "the same envelope space as the ozone converter" and is essentially a drop-in replacement for the ozone converter which provides advancement "at little to no extra cost." The CHOC has the same durable, lightweight design and same long-lasting, high efficiency as the currently utilized ozone converter. As Boeing's lead engineer and FAA designated representative

FILED DATE: 7/20/2021 9:43 AM    2021L007305

Jane Vitkuske noted, the benefits of the CHOC technology include "minimal cost" and little "weight impact."

52.     Boeing's main competitor, Airbus, started installing CHOC converters on Airbus planes in 2006 to 2007. Boeing has still not adopted or implemented this safer alternative.

53.     Boeing consistently and repeatedly refused to allocate adequate resources for the research, development and installation of converters or sensors. Indeed, Boeing repeatedly cut or eliminated budgets for such research and development. On multiple occasions, Boeing put entire air quality projects "on hold" or delayed approving funding by months and even years.

54.     In 2019 and 2020, Boeing's Air Quality team leader, David Space testified that Boeing was deciding to install CHOC converters on some of its bleed airplanes starting in the 2020 to 2021 timeframe, a decision that comes too late to save the Plaintiffs.

**F.     Boeing Failed to Design, Install and/or Implement Sensors.**

55.     Boeing's planes have more than fifty sensors onboard and many of them trigger warnings for the pilots in-flight. But Boeing has never installed a sensor to warn of a contaminated air event. This is because Boeing's management refused to fund the research and development efforts necessary to develop and implement such technology.

56.     A pilot's ability to detect a contaminated air event in-flight is important because, in the cockpit, there is a simple switch that allows the pilot to shut off inflowing air from either engine. If the pilot knows contaminants are entering the air supply because of issues from a specific engine, with just a flip of a switch, the pilot can shut down the air flow on that side of the plane and protect passengers and crew from the toxins.

57.     While pilots have access to pure oxygen masks in the cockpit, and pilots must put them on during contaminated air events to prevent incapacitation, there is no such protection

FILED DATE: 7/20/2021 9:43 AM   2021L007305

available for passengers and flight attendants. The masks that fall from the overhead compartment in the cabin allow for only four to fifteen minutes of oxygen. Sensors are thus important to provide an early warning so pilots can block contaminated air from entering the cabin.

58.     Pilots want sensors as they consider contaminated air events to be "safety" issues and do not want "passengers used as guinea pigs in seats."  The Airline Pilots Association notes that the development and installation of sensors for guarding against toxic cabin air events is "[t]he single most important safety item" for pilots.

59.     The flight crew unions also want sensors. The FAA wants sensors. Industry organizations such as ASHRAE have demanded sensors. Independent scholarly organizations like the National Research Council recommend sensors.

60.     Although a number of sensors have been developed and approved for use in flight, Boeing steadfastly refuses to install them. Boeing's engineers admit that one reason for Boeing's reticence is that Boeing fears the information captured by those sensors (*i.e.* exactly what toxins were actually present during an event and at what levels) could be used against Boeing in litigation. To protect itself, Boeing is willing to risk the safety of passengers and flight crew.

61.     Boeing has long known that its bleed air system is defectively designed. Boeing is aware that safety measures exist or could be developed to mitigate or eliminate the danger. Boeing has made affirmative and intentional decisions *not* to investigate, develop or employ those measures.

62.     Boeing has ample resources to investigate, research, develop and implement safer alternatives. In Boeing's 2018 Annual Report, Defendant reported annual revenue of $101.1 billion. Despite these resources, the Boeing aircraft at issue had a defectively designed bleed air system, was not equipped with appropriate converters or filters to remove air contaminants, and

FILED DATE: 7/20/2021 9:43 AM    2021L007305

did not have a sensor to warn the flight crew. Further, Boeing provided the flight crew with no training on how to handle a contaminated air incident or how to isolate the source of the air contamination so such contamination could be reduced, avoided or stopped.

63.    Boeing knew that cabin air could become contaminated, knew that such contamination could cause health problems and knew that safer alternatives were available that were technologically available and economically feasible. Yet Boeing did not redesign or retrofit the subject aircraft to eliminate or reduce these hazardous events.

64.    Rather than admit the truth about air cabin contamination, Boeing instead deliberately misrepresented the safety of its aircraft. In 1995, for example, Boeing represented at the Aeromedical Medical Association annual meeting that the ECS or Environmental Control System of "today's jetliner is carefully engineered to provide superior cabin air quality."

65.    By 1996, Boeing knew that airlines, including United Airlines, had "expressed concern with bleed air contaminants." Rather than be truthful, Boeing instead told the airlines that the "air quality contaminants meet health and safety guidelines" and acute symptoms were caused by warmer temperatures and "control of the heat in the cabin," rather than toxins.

66.    In 2000, Boeing provided affirmative representations to United Airlines flight crew in an article called "Partners in Safety: Cabin Air Quality." Boeing reassured United flight attendants that their health was "always a top priority" and that symptoms experienced by flight attendants such as "fatigue, headaches, dizziness, light-headedness, nausea, sore throat and illness" was often mistakenly attributed to cabin air quality but flight crew should instead look to other causal factors such as altitude, jet lag, turbulence, dehydration and stress. Boeing had a prime opportunity to educate United flight crew about this safety hazard and, instead, Boeing misrepresented, downplayed and minimized the danger.

FILED DATE: 7/20/2021 9:43 AM   2021L007305

67.     Boeing consistently represented that cabin air quality studies did not indicate that contaminants were affecting cabin air quality. Boeing thus encouraged airlines and crew to look at "multiple factors" as the cause of poor cabin air quality. Further, Boeing reassured flight crew that there were "no additional precautions" that could be taken to improve air quality. In reality, Boeing could have, and should have, installed converters and sensors in its bleed air system planes.

68.     Boeing executives have affirmatively represented that Boeing aircraft are safe. For example, in 2011, Boeing engineer David Space discussed cabin air quality with various airlines and stated that Boeing was committed to providing a "safe, healthy, flying environment." Boeing also represented that its air delivery system "is carefully engineered to provide superior cabin air quality."

69.     By reason of Boeing's decisions, the subject flight attendant crew were exposed to contaminated bleed air, the environmental control system on the subject aircraft lacked converters or filters which would have reduced or eliminated the toxic fumes, and there was no sensor or warning on the subject aircraft to warn the flight crew so remediation action could be taken.

70.     By reason of Boeing's decisions, the subject flight attendants were not properly warned of the health dangers of contaminated cabin air and were ill-equipped to respond to this incident.

71.     Boeing knew of the defects in the subject aircraft, knew that because of such defects the cabin air was not free from harmful or hazardous concentrations of contaminants, was on notice that the defects were likely to cause injury yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and/or failed to take affirmative action to avoid injury to Plaintiffs and others.

14

FILED DATE: 7/20/2021 9:43 AM   2021L007305

## COUNT I:
## STRICT LIABILITY (DESIGN DEFECT)

72.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

73.     Boeing manufactured, designed, promoted, marketed and sold the subject aircraft. At the time the subject aircraft left Boeing's custody and control, it was defective and unreasonably dangerous because:

        a.    Its design rendered the aircraft unreasonably dangerous.

        b.    The danger of this design was beyond that contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

        c.    The benefits of this design are outweighed by the design's inherent risk of danger.

74.     Boeing's design of the subject aircraft made such aircraft unreasonably dangerous in one of more of the following respects:

        a.    The subject aircraft's ventilation system allows bleed air, which can become contaminated with dangerous toxins, to enter the cabin and cockpit air.

        c.    The subject aircraft lacked adequate air quality monitors, sensors or alarms.

        d.    The subject aircraft provides no safeguards or systems so the flight crew could identify the source of the contaminated air or mitigate/prevent contamination of the cabin air.

        e.    The subject aircraft lacked adequate or appropriate converters or filters to reduce, remove or eliminate bleed air contamination.

75.     By reason of the foregoing, the subject aircraft was unreasonably dangerous and defective, and Boeing is strictly liable for the damages sustained by the Plaintiffs.

76.     As a direct and proximate result of Boeing's foregoing design defects, Plaintiffs suffered, and continue to suffer, acute, chronic, and long-term health effects from their exposure to contaminated cabin air and they claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but

FILED DATE: 7/20/2021 9:43 AM    2021L007305

not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

**COUNT II:**
**STRICT LIABILITY (FAILURE TO WARN)**

77.   Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

78.   Boeing failed to adequately warn of the danger of toxic cabin air and/or failed to adequately instruct on the proper use of its aircraft to avoid cabin air contamination in one of more of the following respects:

  a.   The subject aircraft lacked proper warnings regarding the potential of the air supply system to become contaminated.

  b.   The subject aircraft lacked proper warnings regarding the identification or detection of contaminated air.

  c.   The subject aircraft lacked proper warnings regarding the health dangers of exposure to contaminated air.

  d.   Defendants failed to adequately warn or instruct on how to respond, contain or reduce the danger of contaminated air events.

79.   By reason of the foregoing, the subject aircraft was unreasonably dangerous and defective, and Boeing is strictly liable for the damages sustained by the Plaintiffs.

80.   As a direct and proximate result of Boeing's foregoing failure to warn, Plaintiffs suffered, and continue to suffer, acute, chronic, and long-term health effects from their exposure to contaminated cabin air and they claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

16

FILED DATE: 7/20/2021 9:43 AM   2021L007305

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

## COUNT III:
## NEGLIGENCE

81.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

82.     At all times relevant hereto, Boeing owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, selling, marketing, promoting and providing warnings or instructions about the subject aircraft so as not to cause Plaintiffs severe personal injuries and pain and suffering.

83.     Boeing negligently breached its duty of care owed to the Plaintiffs through one or more of the following negligent acts and omissions, when Boeing:

   a.   Negligently designed, manufactured, assembled, and sold the subject aircraft such that its ventilation system allowed contaminated bleed air to enter the breathing zone of the aircraft.
   b.   Negligently designed, manufactured, assembled, and sold the subject aircraft without an adequate or appropriate air quality monitor, sensor or alarm to detect bleed air contamination, to allow the flight crew to identify the source of such contamination and/or permit the flight crew to mitigate, reduce or prevent fume events.
   c.   Negligently designed, manufactured, assembled, and sold the subject aircraft without adequate or appropriate converters or filters to protect cabin air from contamination.
   d.   Negligently designed, manufactured, assembled, and sold the subject aircraft without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposure to such contaminated air.
   e.   Negligently designed, manufactured, assembled, and sold the subject aircraft without knowing the chemical composition of heated aviation jet engine lubricating oil or hydraulic fluid or the byproducts of such as well as the toxicity of these toxins.
   f.   Negligently designed, manufactured, assembled, and sold the subject aircraft without knowing what chemicals or byproducts are created when aviation jet engine lubricating oil or hydraulic fluid is heated to temperatures consistent with those experienced in the engines.

17

FILED DATE: 7/20/2021 9:43 AM    2021L007305

g.    Negligently designed, manufactured, assembled, and sold the subject aircraft without properly testing heated aviation jet engine lubricating oil or hydraulic fluid to fully understand the toxic chemicals and byproducts of such.

h.    Negligently designed, manufactured, assembled, and sold the subject aircraft without knowing the quality of the bleed cabin air.

i.    Negligently failed to incorporate a proper and effective environmental control system or air supply on the subject aircraft.

k.    Negligently failed to properly test the subject aircraft before selling or distributing it.

l.    Negligently failed to adequately maintain, service, retrofit and/or inspect the subject aircraft or add the needed safer alternatives.

m.    Negligently represented, promoted, and marketed its aircraft as being safe and failed to provide adequate warnings and instructions about its aircraft.

n.    Was otherwise negligent and careless.

84.    Boeing owed a duty to adequately warn and instruct about the dangers of its aircraft of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left Boeing's control.

85.    Boeing negligently failed to warn of the defective and unreasonably dangerous conditions of the subject aircraft.

86.    Boeing misrepresented the safety of its aircraft and the dangers of air cabin contamination.

87.    As a direct and proximate result of Boeing's foregoing negligence, Plaintiffs suffered, and continue to suffer, acute, chronic, and long-term health effects from their exposure to contaminated cabin air, and they claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

FILED DATE: 7/20/2021 9:43 AM    2021L007305

## COUNT IV:
### *RES IPSA LOQUITUR*

88.     Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

89.     The Plaintiffs' injuries were caused by the subject Boeing aircraft that they were on at the time of each of their exposures.

90.     The Plaintiffs are foreseeable end users of Boeing's aircraft.

91.     Boeing had a duty to prevent Plaintiffs from being harmed by its aircraft.

83.     The subject aircraft and the entire Environmental Control System (ECS) and bleed air system of the subject aircraft were under Boeing's exclusive control and management.

84.     Boeing exclusively decided whether or not to affix its aircraft with sensors and/or converters, and no other entity could do so without its authority.

85.     Boeing had a duty to the Plaintiffs to anticipate or guard against the contaminated air event which caused the Plaintiffs' injuries.

86.     The occurrence that injured the Plaintiffs is such that, in the ordinary course of things, it would not have happened if Boeing had used proper care to affix sensors and/or converters to the aircraft.

87.     Had Boeing installed air quality sensors and/or appropriate converters on the subject aircraft such devices would have warned the crew so mitigating efforts could have been taken. Boeing could have removed or converted harmful contaminants from the bleed air system and could have minimized, reduced or eliminated Plaintiffs' exposure to contaminated air.

88.     The fume event itself affords reasonable evidence that it arose from want of proper care by Defendant Boeing.

89.     As a direct and proximate result of Boeing's foregoing conduct, Plaintiffs suffered, and continue to suffer, acute, chronic, and long-term health effects from their exposure to

contaminated cabin air, and they claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY in an amount of money in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

## DEMAND FOR JURY TRIAL

90.     Plaintiffs hereby demand a jury trial on all claims so triable in this action.

WHEREFORE, Plaintiffs pray for the entry of a judgment in their favor and against Defendant Boeing, together with costs, attorney fees and such other damages as may be allowed by law.

Signed this 20th day of July, 2021.

/s/ Kathryn L. Conway
Attorneys for Plaintiffs
Joseph A. Power, Jr.
Kathryn L. Conway
POWER ROGERS, LLP
Three First National Plaza
70 West Madison Street, 55th Floor
Chicago, IL 60602
Tel: (312) 236-9381
joepower@powerrogers.com
kconway@powerrogers.com

Zoe B. Littlepage
Rainey C. Booth
T. Matthew Leckman
LITTLEPAGE BOOTH LECKMAN
1912 W. Main St.
Houston, TX 77098
Tel: (713) 529-8000
zoe@littlepagebooth.com
rainey@littlepagebooth.com
matt@leckmanlaw.com

FILED DATE: 7/20/2021 9:43 AM   2021L007305

FILED DATE: 7/20/2021 9:43 AM  2021L007305

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

LUCA BENUSSI, HUGH CURRY, )
HARJOAT FLORA, KAREN MILLS, )
SUSANNE PEDERSON and )
LOUISE STEELE, )
                        )
            Plaintiffs, )
                        )
          v.              )     NO.
                        )
THE BOEING COMPANY, )
                        )
            Defendant. )
_____ )

### ATTORNEY AFFIDAVIT

       NOW comes Affiant, Kathryn L. Conway, and being first duly sworn on oath, deposes and states:

1. That she is one of the attorneys representing Luca Benussi, Hugh Curry, Harjoat Flora, Karen Mills, Susanne Pederson and Louise Steele in the above cause of action.

2. That she is familiar with the facts in the above cause of action.

3. That she has reviewed the available information to the money damages in the above matter.

4. That based upon information and belief, the total money damages sought in the above cause are worth in excess of Fifty Thousand Dollars ($50,000.00).

                                    /s/ Kathryn L. Conway

Kathryn L. Conway
Attorney for Plaintiffs
POWER ROGERS, LLP
70 W. Madison Street, 55th Floor
Chicago, IL  60602-4212
#65400
312-236-9381
312-236-0920 – fax
kconway@powerrogers.com